E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER SCHWAB (Cal. Bar No. 283421)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-1259
     Facsimile: (213) 894-0141
     E-mail:    alexander.schwab@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-155-FMO |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Hearing Date: October 12, 2023 |
| JOHN A. SANTILLI, JR., | Hearing Time: 11:00 a.m. |
| Defendant. | Location: Courtroom of the Hon. Fernando M. Olguin |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Alexander Schwab, hereby files its sentencing position.

    This sentencing position is based on the attached memorandum of points and authorities, the files and records in this case (including

//
//

the presentence investigation report "PSR"), the victim-impact letters filed under seal as Exhibit A, and such further evidence and argument as the Court may permit.

Dated: September 25, 2023  Respectfully submitted,

  E. MARTIN ESTRADA
  United States Attorney

  MACK E. JENKINS
  Assistant United States Attorney
  Chief, Criminal Division


            /s/
  ALEXANDER SCHWAB
  Assistant United States Attorney

  Attorneys for Plaintiff
  UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ............................................. ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION...................................................1

II.   STATEMENT OF FACTS............................................1

III. SENTENCING GUIDELINES.........................................6

    A.   Ten or More Victims........................................7

    B.   Sophisticated Means.......................................7

IV.  ARGUMENT......................................................8

    A.   The Seriousness of Defendant's Crime, Which Extends
        Beyond the Financial Harm He Inflicted on His Victims,
        Supports a 78-Month Sentence..............................8

    B.   A 78-Month Sentence Is Necessary To Provide Both
        General and Specific Deterrence..........................10

V.   RESTITUTION..................................................12

VI.  CONCLUSION...................................................14

**TABLE OF AUTHORITIES**

**CASES**                                                          PAGE(S)

United States v. Catherine,
  55 F.3d 1462 (9th Cir. 1995) ........................................ 16

United States v. Eyraud,
  809 F.3d 462 (9th Cir. 2015) ........................................ 16

United States v. Horob,
  735 F.3d 866 (9th Cir. 2013) ......................................... 9

**STATUTES**

18 U.S.C. § 3553(a) .............................................. 10, 12

18 U.S.C. § 3663 ..................................................... 13

18 U.S.C. § 3663A .................................................... 12

**RULES**

Fed. R. Crim. P. 32(f)(1) ............................................. 6

**SENTENCING GUIDELINES**

USSG § 2B1.1 ..................................................... passim

USSG § 5H1.4 ......................................................... 12

**MISCELLANEOUS**

S. Rep. No. 98-255 (1983),
  reprinted in 1984 U.S.C.C.A.N. 3182 ............................ 10, 12

Stephanos Bibas, "White-Collar Plea Bargaining and Sentencing After
  Booker," 47 Wm. & Mary L. Rev. 721 (2005) ........................ 11

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

With a compelling sales pitch, defendant John A. Santilli, Jr., offered his victims an exclusive opportunity to invest in a Las Vegas show based on the Magic Mike film franchise. Over several years, defendant scammed his victims out of millions through an intricate web of lies, fabricated documents, oversold securities, and corporate shells. And when it became clear the emperor had no clothes, defendant gaslit his victims, concocting excuses and false promises of repayment while spending their money on himself, including his prodigious gambling habit. The consequences of defendant's greed and mendacity were severe: over $4.2 million in losses to more than a dozen victims, along with the lasting psychological harm he inflicted. As one victim writes, "When someone uses your trust to steal from you, the consequences are far more pervasive than just the devastating financial losses. The lies that John Santilli told me were used to rob me of my sense of reality." (Exh. A, at 3).

The government agrees with the PSR's calculation of defendant's sentencing guidelines and recommends a midrange sentence of 78 months' imprisonment followed by three years of supervised release, restitution of $4,096,782.17, and a $200 special assessment.[1]

## II. STATEMENT OF FACTS

As part of defendant's plea agreement and during his plea colloquy, defendant agreed to the following facts:

---

[1] The government recommends that the Court, at sentencing, verify that defendant has been informed of the standard conditions of supervised release enumerated in General Order 20-04, and then incorporate by reference and impose those conditions.

Mike's Mobile Detailing, LLC ("Mike's Mobile Detailing") is a Delaware limited liability company that operates "Magic Mike Live," a live revue stage show at the Hard Rock Hotel and Casino in Las Vegas, Nevada, based on the films Magic Mike and Magic Mike XXL, which provide fictional accounts of life as a male stripper. As a limited liability company, Mike's Mobile Detailing issued Class A Units to its members, with the Class A Units constituting "securities" within the meaning of the Securities Exchange Act of 1934. One such member of Mike's Mobile Detailing was Aloris Entertainment, LLC ("Aloris 1"), a Rhode Island limited liability company partly owned and managed by defendant. Aloris 1 became a member of Mike's Mobile Detailing after entering into an August 2, 2016, Limited Liability Company Agreement (the "August 2016 LLC Agreement"), which defendant signed as Aloris 1's owner. As a member, Aloris 1 acquired 1,875,000 Class A Units of Mike's Mobile Detailing. The August 2016 LLC Agreement provided, among other things, that "no Member may directly or indirectly Transfer all or any part of such Member's Units or, with respect to [Aloris 1], the membership interests in [Aloris 1] (including any right to receive distributions or allocations in respect of such Interests) . . . without the prior written consent of the majority of the disinterested Managers on the Board."

In addition to Aloris 1, defendant was manager and general partner of Aloris Magic Mike LP ("Aloris 2"), a Delaware limited partnership. Aloris 2 held no interest in Mike's Mobile Detailing, LLC.

Beginning on a date unknown, but no later than in or about June 2016, and continuing through at least in or about February 2020, in Los Angeles County, within the Central District of California, and

1 elsewhere, defendant, knowingly and willfully, directly and
2 indirectly, by the use of the means and instrumentalities of
3 interstate commerce and the mails, in connection with the purchase
4 and sale of Mike's Mobile Detailing securities, Aloris 1 securities,
5 and Aloris 2 securities, used and employed manipulative and deceptive
6 devices and contrivances, by: (1) employing a scheme to defraud;
7 (2) making untrue statements of material facts and omitting to state
8 material facts necessary in order to make the statements made, in
9 light of the circumstances under which they were made, not
10 misleading; and (3) engaging in acts, practices, and courses of
11 business which operated and would operate as a fraud and deceit upon
12 purchasers and prospective purchasers of Mike's Mobile Detailing
13 securities, Aloris 1 securities, and Aloris 2 securities (the
14 "victims"), by causing materially false and fraudulent statements and
15 material omissions to be made to the victims about defendant's
16 ability and authority to sell the securities to the victims.  During
17 the same time period, defendant, knowingly and with the intent to
18 defraud, also knowingly devised, participated in, and executed a
19 scheme to defraud victims as to material matters, and to obtain money
20 and property by means of material false and fraudulent pretenses,
21 representations, promises, and the concealment of material facts.
22 The schemes operated in the following manner:
23     Defendant offered victims investment contracts that constituted
24 "securities" under the Securities Exchange Act of 1934.  These
25 investment contracts purported to sell victims an ownership interest
26 in either Aloris 1 or Aloris 2 -- though typically Aloris 2 -- with
27 defendant representing that these ownership interests corresponded to
28 a specific number of Mike's Mobile Detailing Class A Units held by

3

Aloris 1 or Aloris 2. The investment contracts also provided the victims the right to a percentage of the distributions that would be paid to the holders of the Class A Units.

Defendant made false representations to his victims with regard to Aloris 1 and Aloris 2. As to Aloris 1, defendant falsely represented to victims that Aloris 2 owned Class A Units even though defendant knew Aloris 2 had no such ownership interest. In furtherance of the scheme and in order to persuade the victims that Aloris 2 owned Class A Units, defendant modified the August 2016 LLC Agreement to make it falsely describe Aloris 2 as a member of Mike's Mobile Detailing when, in fact, as defendant then knew, Aloris 2 was not a member in Mike's Mobile Detailing. In fabricating this version of the August 2016 LLC Agreement, he used the means of identification of real people -- specifically, the names and signatures of two actual signatories to the August 2016 LLC Agreement. He attached this doctored version of the agreement to an email he sent to one of his victims by means of interstate wire communication on September 17, 2016.

As to Aloris 1, defendant falsely represented that he had the authority to sell an ownership interest in Aloris 1 even though, in fact, as he then knew, he did not. Aloris 1 was prohibited from selling the Class A Units, a membership interest in Aloris 1, or the right to receive distributions based on that membership interest without the written consent of the majority of the Board of Mike's Mobile Detailing. Defendant never sought or obtained such consent.

In addition to falsely representing that he had authority to sell the interests in the Class A Units, defendant sold interests corresponding to nearly twice the number of Class A Units Aloris 1

4

actually possessed.  In soliciting investors, defendant represented to them that the interests he was selling in his entities corresponded to a particular number of Class A Units.  Though neither defendant nor his entities ever held more than 1,875,000 Class A Units, he sold his victims shares in his entities that, taken together, he represented to correspond to over 3,500,000 Class A Units.

As part of Aloris 1's acquisition of 1,875,000 Class A Units, it was obligated to pay various installments of its $1,875,000 investment by certain dates.  But because defendant spent a significant portion of the victims' investments on personal expenses before making all of these installment payments, defendant solicited additional investments from victims under the false pretense that additional Class A Units and ownership interests in Aloris 2 had become available for purchase when, in fact, he used these funds to complete Aloris 1's original purchase of the 1,875,000 Class Units. Defendant also used a significant portion of the victims' funds for purposes unrelated to investments in Mike's Mobile Detailing, including the withdrawal of more than $1 million in victim funds at various casinos across the United States, where he used the money to gamble.

To maintain the scheme and to avoid its detection, defendant falsely represented to one victim, who had voiced concerns about defendant's lack of financial transparency, that defendant would repay the principal on a $375,000 investment that the victim had made.  Defendant then mailed that victim two cashiers' checks.  After mailing those checks to the victim, defendant caused Citibank, which had issued those cashiers' checks, to cancel payment by submitting,

5

on March 27, 2018, a "Stop Payment Request and Indemnity Agreement." In the forms, defendant falsely represented to Citibank that the cashiers' checks had been lost.

As a result of the scheme to defraud, defendant caused approximately $4,258,679.64 in losses to his victims. (Plea Agreement ¶ 13, at 9-13).

## III. SENTENCING GUIDELINES

The government agrees with the Probation Office's calculation of the sentencing guidelines:

| | | |
|---|---|---|
| Base Offense Level | 7 | USSG § 2B1.1(a)(1) |
| Loss > $3.5 million | +18 | USSG § 2B1.1(b)(1)(J) |
| ≥ 10 Victims | +2 | USSG § 2B1.1(b)(2)(A)(i) |
| Sophisticated Means | +2 | USSG § 2B1.1(b)(10)(C) |
| Acceptance of Responsibility | -3 | USSG § 3E1.1 |

(PSR ¶¶ 35-50, at 9-10). Coupled with defendant's criminal history, which places him in Category II, defendant's guideline range is 70 to 87 months' imprisonment. The government recommends a sentence of 78 months' imprisonment, which falls in the middle of the guideline range.

Defendant stipulated to the fact that he caused a loss of approximately $4,258,679.64, but the parties left open their ability to argue for the applicability of other adjustments under the Sentencing Guidelines. (Plea Agreement ¶ 15, at 14). The Probation Office correctly concluded that defendant's offense conduct affected at least ten victims and involved sophisticated means, and the time has passed for defendant to object to the PSR. See Fed. R. Crim. P. 32(f)(1). In any event, the PSR's conclusions are correct.

6

### A. Ten or More Victims

The PSR identifies twenty victims who sustained financial losses as a result of defendant's crimes, which is well over the threshold of ten or more victims under USSG § 2B1.1(b)(2)(A)(i). In some instances, those victims pooled their funds through investment vehicles, but under the Sentencing Guidelines, the result is the same.

The Guidelines define a victim as "any person who sustained any part of the actual loss determined under subsection (b)(1)." USSG § 2B1.1, comment. (n.1). Likewise, "'[a]ctual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense.'" Id., comment. (n.3(A)(i)). "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money.'" Id., comment. (n.3(A)(iii)). In this case, the pecuniary harm to investment vehicles resulted in losses to identifiable individuals -- losses that were readily apparent to defendant, since he was negotiating with individuals, and not representatives of some large corporation whose shareholders are far-removed from the individualized losses sustained. The number of victims should therefore be measured by the number of individual investors who suffered financial losses, which is precisely what the Probation Office did.

### B. Sophisticated Means

The sophisticated means adjustment readily applies to defendant's use of forged legal documents and shell companies with confusingly similar names. In fact, the application note for the adjustment expressly notes that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities [or]

7

corporate shells . . . ordinarily indicates sophisticated means." USSG § 2B1.1, comment. (n.9(B)) (emphasis added); see also United States v. Horob, 735 F.3d 866, 872 (9th Cir. 2013) (considering the fact that a defendant "fabricated numerous documents" in concluding that he qualified for a sophisticated means adjustment). As the PSR aptly summarizes, defendant operated "two apparent shell companies with misleading names that had no membership in [Mike's Mobile Detailing], and held no interest in [Mike's Mobile Detailing] securities. Similarly, he used the names and signatures of two actual in [Mike's Mobile Detailing] signatories in attaching a doctored version of the August 2016 LLC Agreement to an email sent to a victim." (PSR ¶ 42, at 10). To further conceal his scheme, "when an investor questioned Santilli's transparency, Santilli stated that he would repay the principal investment with a cashiers' check, which he purchased, sent, and later reported to the bank as having been lost." (Id.). Defendant is a sophisticated businessman, and he used that sophistication to further victimize his investors.

**IV. ARGUMENT**

    **A. The Seriousness of Defendant's Crime, Which Extends Beyond the Financial Harm He Inflicted on His Victims, Supports a 78-Month Sentence**

About twenty victims fell prey to defendant's scheme. (PSR ¶ 117, at 21-22). Believing his lies, they trusted him with more than $4.2 million in investments. Those lies were successful because defendant was convincing. He fabricated documents with the names and signatures of real people and juggled an array of companies with confusingly similar names. And the cost of defendant's scheme was so large because defendant's greed was insatiable. Not only did he misappropriate investor money and misrepresent his authority to sell

8

interests in the Magic Mike show, but he sold interests corresponding to nearly double the securities he actually held.

But while the millions defendant stole from his victims provides a straightforward measure of the scope of the offense, it fails to capture the psychological toll defendant's crimes have inflicted. Investment fraud carries with it a sense of violation that compounds the victims' hardship. One victim, who, relying on defendant's lies, convinced friends and family to invest, describes "an ongoing sense of anxiety and hesitation" he feels "when speaking to over 10 of my closes friends and family for over the past five years when I try to help find answers to what happened to their money." (Exh. A, at 8). Another writes that "the stress and anxiety over the years has been overwhelming. The exhausting legal process of the lawsuit led to a lot of sleepless nights, and my wife and I continue to have many heated discussions about John Santilli, his crimes, and how I was scammed." (Exh. A, at 4).

The betrayal of trust is also a common refrain among the victim-impact letters in this case. One victim describes both his "financial loss" and "loss of trust in individuals," noting that defendant "acted like he was your friend but continued to lie." (Exh. A, at 18). Another discusses how, "[o]nce I discovered that we had been defrauded, I was furious with myself, and felt so humiliated to have fallen for John Santilli's scam. I developed a lack of trust in my own judgment that exists to this day." (Exh. A, at 3). The lack of trust can itself be painful, but it can also carry with it a tangible price, as victims suffer reputational harms that hamper their own ability to raise future investments. (Exh. A, at 3-4).

9

Defendant's crime had real-world consequences for the people who placed their trust in him -- a fact the sentence must reflect.

### B. A 78-Month Sentence Is Necessary To Provide Both General and Specific Deterrence

By the time defendant's scam had been laid bare, he had frittered away more than $4.2 million of his victims' money. The sad reality is that, even with a guarantee of eventual apprehension, many individuals would gladly accept the prospect of a brief stint in prison in exchange for the millions defendant stole. And, of course, there is no guarantee of apprehension at all, particularly when perpetrated by someone, like defendant, who preyed on his victims' trust. To afford adequate deterrence, the sentence in this case must therefore account both for the profitability of fraud schemes like defendant's and the difficulty in uncovering them. In fact, Congress, in drafting § 3553, confirmed that "[t]o deter others from committing the offense . . . is particularly important in the area of white collar crime." S. Rep. No. 98-255, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress was particularly concerned with the fact that "[m]ajor white collar criminals often are sentenced to . . . little or no imprisonment," which the offenders disregard as "a cost of doing business." Id. A 78-month sentence provides the type of deterrence needed in this case.

While the need for general deterrence exists in every significant white-collar case, defendant's history and behavior exhibit a need for specific deterrence as well. Defendant has a reckless driving misdemeanor conviction arising from a traffic stop for drunk driving (PSR ¶ 55, at 11), and while this is not a significant criminal history on its own, defendant's subsequent

behavior speaks to his contempt for the law.  As the PSR describes, a bench warrant was issued in 2013 after defendant failed to appear, and years later, his probation was revoked for failure to enroll in a court-ordered alcohol program.  (Id.).  And though the case is still pending, defendant is currently facing state charges in Rhode Island for misappropriating investor funds intended for a Tales from the Crypt film project.  (PSR ¶ 60, at 12).  As in this case, defendant appears to have blown the money at various casinos.  (Id.).

More recent conduct suggests that defendant continues to downplay his crimes.  One victim has found that, even after pleading guilty to securities and wire fraud, a website (https://www.johnsantilli.film/) was registered touting his work on the Magic Mike Live show -- the very project that is the subject of the fraud prosecution in this case.[2]  As that victim writes, "Imagine the insult that we, his victims, feel when John Santilli uses the crimes for which he has been convicted for self promotion and credibility."  (Exh. A, at 5).

Defendant's sentence is not merely a question of deterrence, however.  Respect for the law is also not promoted if white-collar criminals face a slap on the wrist while crimes associated with poverty are punished harshly.  Otherwise, "judges may be indulging unconscious racial and class stereotypes by going easy on defendants who remind judges of themselves or with whom judges can identify." Stephanos Bibas, "White-Collar Plea Bargaining and Sentencing After Booker," 47 Wm. & Mary L. Rev. 721, 724 (2005).  Historically, Congress has reacted to the fact that "white collar offenders . . .

---

[2] See https://who.is/whois/johnsantilli.film (listing a registration date of December 12, 2022).

11

1  frequently do not receive sentences that reflect the seriousness of
2  their offenses."  S. Rep. No. 98-255, at 77, 1984 U.S.C.C.A.N. at
3  3260.  In fact, Congress explicitly sought to correct "historical
4  patterns" for "white collar offenses for which plainly inadequate
5  sentences have been imposed in the past."  Id. at 116.
6      Finally, while it is certainly true that defendant gambled away
7  a substantial share of his victims' money, a gambling addiction is
8  not a mitigating factor.  In fact, the Sentencing Guidelines
9  explicitly prohibit consideration of gambling addiction as a
10 mitigating factor in support of a downward departure.  USSG § 5H1.4
11 ("Addiction to gambling is not a reason for a downward departure.").
12 Common sense dictates the same result: If gambling addiction is an
13 irremediable compulsion, then defendant poses all the greater danger
14 to society and the need for specific and general deterrence
15 increases.  If, on the other hand, gambling addiction can be overcome
16 -- a hypothesis that defendant's own subsequent behavior in this case
17 supports (PSR ¶ 84, at 16) -- then it should be viewed as no more a
18 mitigating factor than any other selfish motive driving a defendant's
19 criminal conduct.  While it is true that the Sentencing Guidelines
20 are not mandatory, gambling addiction is not an extraordinary
21 situation that the United States Sentencing Commission failed to
22 contemplate that must instead be addressed under 18 U.S.C. § 3553(a).
23 Rather, it is a factor that the Sentencing Commission has explicitly
24 rejected as a potential mitigating factor.

**V.   RESTITUTION**

26     Restitution is mandatory in this case.  See 18 U.S.C.
27 § 3663A(b).  While $4,258,679.64 provides an accurate measure of the
28 loss for purposes of the Sentencing Guidelines, that figure should be

modified under the Mandatory Victims Restitution Act in a manner that redounds to defendant's benefit.  Under the Sentencing Guidelines, a defendant receives credit only for "[t]he money returned . . . to the victim before the offense was detected," which therefore excludes civil judgments.  USSG § 2B1.1, comment. (n.3(E)(i)).  On the other hand, in calculating the loss figure for purposes of § 2B1.1, the Sentencing Guidelines exclude consideration of interest or other costs.  Id. § 2B1.1, comment. (n.3(D)(i)).  The opposite holds true for determining restitution, however.  "Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim" in civil proceedings.  18 U.S.C. § 3663(j)(2).  Restitution also "can include prejudgment interest," since a "defendant's culpability will not always equal the victim's injury." United States v. Catherine, 55 F.3d 1462, 1465 (9th Cir. 1995).  It also includes attorney's fees "incurred by private parties as a direct and foreseeable result of the defendant's wrongful conduct." United States v. Eyraud, 809 F.3d 462, 468 (9th Cir. 2015).

Currently, the PSR recommends restitution of $1,269,509.97 to victim E.L.  (PSR ¶ 117, at 21).  That victim successfully sued defendant, obtaining a default judgment against him and eventually receiving recognition by Mike's Mobile Detailing of an interest in about a million Class A Units.  (Exh. A, at 1-2).  This still left this victim with a shortfall of $412,603 and legal bills of approximately $695,000, for a total loss of $1,107,603. Additionally, victim N.T. calculates losses of $62,477.95, which is fifty cents less than the $62,478.45 listed in the PSR.  In total, the losses are therefore $161,907.47 less than what the Probation

13

Office calculated, resulting in a total restitution figure of **$4,096,782.17.**

**VI.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 78 months' imprisonment followed by three years of supervised release, restitution of $4,096,782.17, and a $200 special assessment.